2000 ME 38

**STATE of Maine**

v.

**Clifford SHATTUCK.**

Supreme Judicial Court of Maine.

Argued Jan. 4, 2000.

Decided Feb. 29, 2000.

Andrew Ketterer, Attorney General, Linda Conti, Asst. Attorney General (orally), Kathleen Roberts, Asst. Attorney General, Augusta, for plaintiff.

Frederick M. Newcomb III (orally), Newcomb & Reynolds, P.A., Rockland, for defendant.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, and CALKINS, JJ.

SAUFLEY, J.

[¶ 1] Clifford Shattuck, doing business as The Lighthouse Motel and Cottage Court, appeals two orders entered in the Superior Court (Kennebec County, *Marden, J.*) denying Shattuck's Rule 60(b) motion for relief from a 1996 consent decree, finding Shattuck in contempt of the same consent decree, and granting the State further injunctive relief. Finding no error, we affirm.

## I. BACKGROUND

[¶ 2] Clifford Shattuck has owned and operated The Lighthouse Motel and Cottage Court on U.S. Route 1 in Lincolnville since 1982. This seasonal business includes nine motel rooms, thirteen free-standing cottages, a coffee shop, an office, and the Shattuck summer residence. Shattuck runs the motel from March through Columbus Day Weekend every year with his wife and two part-time employees.

[¶ 3] Between 1993 and 1998, The Lighthouse Motel was responsible for approximately one-third of all public accommodation complaints filed with the Camden–Rockport–Lincolnville Chamber of Commerce. Unlike other accommodation-related complaints, which relate primarily to cleanliness, the complaints lodged against The Lighthouse Motel were directed at Shattuck's behavior toward his customers. In 1994, the State filed a complaint in the Waldo County Superior Court alleging that Shattuck had violated the Maine Civil Rights Act "by assaulting, threatening, intimidating, coercing or harassing people who sought lodging at his motel because of race, religion, color, national or ethnic origin or sexual orientation." Shattuck, through counsel, resolved the matter by entering into a consent decree and order enjoining him from "assaulting, threatening, intimidating, coercing or harassing, or attempting to assault, threaten, intimidate, coerce or harass, any person ... because of that person's race, religion, color, national or ethnic origin or sexual orientation." Shattuck was assessed and paid a civil penalty of $3000.

[¶ 4] The 1994 consent decree was only partially effective. Although he continued to treat his customers in an assaulting,

threatening, intimidating, coercing, and harassing manner, Shattuck apparently no longer targeted a particular group of people. Because of continued complaints, the State again filed another complaint against Shattuck in 1996, alleging violations of the Unfair Trade Practices Act. Shattuck and his wife, this time unrepresented by counsel, met with an assistant attorney general and entered into a new consent decree on September 4, 1996. The decree enjoined Shattuck from "engaging in abusive, rude, irrational, physically assaultive and damaging conduct to persons seeking lodging at his motel; and ... violating the provisions of the Unfair Trade Practices Act." The consent decree was submitted to the Superior Court, where it was accepted by the court (*Alexander, J.*) and entered as a judgment of the court. Shattuck also paid the State $3500 for the cost of the suit and the State's investigation.

[¶ 5] Once again, the new consent decree failed to induce the desired result. Specifically, on the State's motion for contempt, the Superior Court heard evidence related to three incidents during the 1998 season. The first incident occurred over Memorial Day weekend when two women asked if they could see a room before committing to rent it. Shattuck announced in "an argumentative and coercive manner" that he did not allow people to see rooms before paying for them. The women decided to look for lodging elsewhere, and returned to their vehicle. The Superior Court recounted the events as follows:

> Upon entering their automobile, the women discovered the defendant standing directly in front of the car so that it was impossible for them to turn the car around without injuring the defendant. In spite of ample turnaround space, the defendant ordered the women not to turn around but to back down the driveway. The manner in which the defendant conducted himself caused the women to be frightened and they backed their vehicle down the driveway and out onto Route 1 in order to proceed.

[¶ 6] The Superior Court found that a second incident occurred in July 1998 when a couple asked to see a room before deciding whether to stay at the motel. After Shattuck made it clear that he would not allow them to see a room in advance, the husband turned to his wife and said, "Do you want to gamble?" Shattuck immediately became very angry, throwing his arms in the air and screaming, "I don't like your attitude, take your money somewhere else, get out of here." The couple left hurriedly, feeling very threatened as Shattuck continued to yell at them through the screen door.

[¶ 7] Finally, the court found that a third incident occurred, which took place on Mother's Day 1998. A man testified that after seeing a vacancy sign, he and a female companion pulled onto the premises to investigate. They were met by Shattuck who was "acting like a 'raging lunatic.'" Shattuck "blocked [their] car leaning over the front hood and preventing them from backing out or leaving the premises." The woman began to cry and the man got out of the car advising Shattuck to either get out of his way or call the police. Shattuck remained, screaming and threatening the couple, in front of the car for approximately ten minutes, before eventually moving and allowing them to leave. The woman felt terrorized by the experience.

[¶ 8] When the State filed its motion pursuant to 5 M.R.S.A. § 209 (1989 & Supp.1999) requesting that the court assess civil penalties for each violation of the 1996 consent decree, it also moved to amend the 1996 decree to enjoin Shattuck from having contact with motel patrons. Shattuck then moved, pursuant to M.R. Civ. P. 60(b), for relief from the 1996 decree. After hearing testimony on all three motions, the Superior Court denied Shattuck's Rule 60(b) motion for relief, sanctioned Shattuck for violating the 1996 consent decree, and modified the decree to enjoin Shattuck from having contact with motel patrons. This appeal followed.

## II. DISCUSSION

[¶ 9] Shattuck contends that the Superior Court (1) abused its discretion in denying his motion for relief pursuant to Rule 60(b); (2) erred in concluding that his behavior violated the UTPA; (3) lacked the authority to modify the injunctive order; and (4) abused its discretion in assessing sanctions. We discuss each claim in turn.

### A. Rule 60(b)

[¶ 10] Shattuck filed a motion for relief from the 1996 consent decree pursuant to Rule 60(b)(1) and (4).[1] We review the Superior Court's denial of a Rule 60(b) motion for abuse of discretion. *See Department of Human Servs. v. Sabattus*, 683 A.2d 170, 171 (Me.1996). We will vacate such a judgment only when the denial of the Rule 60(b) motion works a plain and unmistakable injustice against the party. *See Harris v. PT Petro Corp.*, 650 A.2d 1346, 1348 (Me.1994).

[¶ 11] Shattuck argues that relief from the 1996 decree was required because the court lacked personal jurisdiction over him at the time the consent decree was entered. Specifically, Shattuck contends that the court could not have obtained personal jurisdiction over him because he did not knowingly and voluntarily consent to personal jurisdiction when he signed the 1996 decree. In support of this argument, he asserts that he (1) never "appeared" in the action; (2) never received notice that a court action had been started; and (3) did not realize that a court action would result from his signing the decree.

[¶ 12] These arguments lack merit. Shattuck does not dispute that he received a copy of the complaint, met with agents for the State to negotiate a settlement, and signed the consent decree containing express acknowledgment that the "court has jurisdiction over Plaintiff and Defendant

Shattuck . . . and the subject matter of this action." Shattuck also understood that the decree would be filed with the court. Indeed, the record reflects that the State agreed to Shattuck's request to delay the filing of the consent decree with the court until after a social event at the hotel had been completed. The fact that Shattuck was not represented during the initial proceeding does not change the analysis. *See Richards v. Bruce*, 1997 ME 61, ¶ 8, 691 A.2d 1223, 1225. There is ample evidence in the record supporting the Superior Court's conclusion that the court had personal jurisdiction over Shattuck at the time the consent decree was filed.

### B. UTPA Violations

[¶ 13] Shattuck next contends that the Superior Court erred in determining that his behavior violated the UTPA. The UTPA makes unlawful " '[u]nfair methods of competition and unfair or deceptive practices in the conduct of any trade or commerce.' " *Bangor Publ'g Co. v. Union St. Mkt.*, 1998 ME 37, ¶ 7, 706 A.2d 595, 597 (quoting 5 M.R.S.A. § 207 (1989)). "Neither term as used in Maine's UTPA can be precisely defined, and their applicability should be determined on a case by case basis." *Guiggey v. Bombardier*, 615 A.2d 1169, 1172 (Me.1992). We review the Superior Court's conclusions for clear error. *See Sebago Lake Camps, Inc. v. Simpson*, 434 A.2d 519, 521 (Me.1981).

[¶ 14] The court concluded that under "most circumstances" Shattuck's policy not to "pre-show" rooms standing alone would not be unfair, but concluded that in the current context it was unfair because Shattuck entices customers onto his property and "creates a situation in which he can selectively abuse the traveling public." We agree. Shattuck's response to customers' questions regarding the policy was

---

1. Because Shattuck's motion was filed over two years after the order, we need not discuss his allegations made pursuant to Rule 60(b)(1). *See* M.R. Civ. P. 60(b) (requiring that the "motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken").

demonstrated to have been not merely rude but frightening and threatening to potential customers.

█ [¶ 15] Similarly, Shattuck's policy of allowing only "patrons" to turn around in the motel driveway is both abusive and unfair in its enforcement. As the court concluded, backing out onto Route 1 can be an unpleasant and dangerous experience. Shattuck's behavior in forcing frightened and tearful prospective customers to back out of his property onto a busy thoroughfare, rather than turn around and drive out into the traffic, was also demonstrated to have been sufficiently outrageous and dangerous that the court did not err in finding the conduct to have violated the UTPA.[2]

█ [¶ 16] We agree with Shattuck that the UTPA does not control simple rude or boorish behavior on the part of merchants.[3] However, when the conduct of a merchant repeatedly frightens, terrorizes, or physically endangers the public, and when that conduct is sufficiently outrageous that it may reasonably be understood to have such an effect, that conduct is "unfair" within the meaning of the UTPA. The record reflects sufficient facts to support the Superior Court's conclusion that Shattuck's behavior rose to the level of an unfair trade practice.

C. Court's Authority

█ [¶ 17] Shattuck argues that the consent decree was an agreement between himself and the State, and maintains that the Superior Court lacked the authority to modify the decree, relying on *Berry v. Somerset Railway*, 89 Me. 552, 554, 36 A. 904, 905 (1897). Shattuck's reliance on *Berry*, however, is misplaced. *Berry* in-

volved an agreement that was "not an entry ordered by the court." *Id.* In contrast, once the court signed the consent decree between Shattuck and the State, it became a judgment of the court. Contrary to Shattuck's contention, the court does not ordinarily treat a judgment entered upon agreement of the parties differently than a judgment entered after hearing or other adversarial process. As we have made clear, "consent to the entry of a decree does not serve to deprive the court of the power to modify the decree." *Clifford v. Klein*, 463 A.2d 709, 713–14 (Me. 1983) (citing *System Fed'n No. 91 v. Wright*, 364 U.S. 642, 646–47, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961)).

█ [¶ 18] We recognize that, because a consent decree is the product of negotiations by parties who elect to waive their rights to litigate and, instead, reach a compromise in which the parties each give up something they might have won through litigation, *see United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971), such a decree is in some respects contractual in nature, *see Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). Nonetheless, "it is an agreement that the parties desire and expect will be reflected in, and enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo*, 502 U.S. at 378, 112 S.Ct. 748. Thus, when the court is otherwise authorized to amend a judgment, it may do so whether the judgment was entered through litigation or consent. *See Clifford*, 463 A.2d at 709; *Rufo*, 502 U.S. at 378–79, 112 S.Ct. 748.

█ [¶ 19] A court is authorized to amend an injunction when the circum-

---

2. *See Levesque v. Williamsburg Assocs.*, No. CV93 052 62 35 S, 1995 WL 91418 (Conn.Super.Ct. Feb. 17, 1995) (holding "prolonged course of dangerous conduct" actionable under Unfair Trade Practices Act).

3. On this issue, we note that the 1996 injunctive order, drafted by the Attorney General's

office to reflect the parties' agreement, was clearly overbroad, particularly in its attempt to prohibit merely rude or irrational behavior. Because the court did not rely on that part of the order in reaching its findings here, we need not address this deficit.

stances giving rise to the injunction have changed since the entry of the injunction. *See Clifford,* 463 A.2d at 714. Although modification of a consent decree is an available remedy, in the absence of a new agreement of the parties, it is not a remedy to be casually undertaken. *See Walker v. United States Dep't of Hous. & Urban Dev.,* 912 F.2d 819, 826 (5th Cir.1990). A party who originally waived his right to litigate a request for an injunction is entitled to no less due process on a motion to modify the agreed upon injunction than a party who litigated the original request.[4] A court may not make a modification without an adjudication or admission either that the defendant violated the existing consent decree or that other circumstances have arisen since the entry of the decree warranting a modification of the injunctive relief. *See Clifford,* 463 A.2d at 714; *Rufo,* 502 U.S. at 380, 112 S.Ct. 748.[5] Moreover, the court must be convinced that modification is essential to remedy the situation. *See Clifford,* 463 A.2d at 714.

[¶ 20] Accordingly, before imposing additional responsibilities on a party subject to an order of injunction, the court must assure that the defendant has received notice that the court may impose obligations different from, or in addition to, those contained in the judgment and that the parties have an opportunity to present relevant evidence on the need for the additional obligations and the proper character of those obligations. Additionally, the court should make specific findings of fact that support a determination that modification is warranted. *See Johnson v. Robinson,* 987 F.2d 1043, 1050 (4th Cir. 1993); *United States v. Western Elec. Co.,* 894 F.2d 430, 437 n. 12 (D.C.Cir.1990).[6]

[¶ 21] In the present case, the record reflects (1) that Shattuck had notice of the fact that the trial court was considering imposing the additional requirement that he refrain from contact with customers; (2) that Shattuck was provided an opportunity to present evidence refuting the State's position that such a modification was necessary; and (3) that the trial court's decision and order contained specific facts sufficient to support its decision to impose such a drastic measure. At hearing, the State introduced evidence of facts occurring since the entry of the decree. From that evidence, the court found that the circumstances had changed, that Shattuck had not complied with the original decree, and that further injunctive relief was warranted by the facts. Accordingly, the court acted within its authority when it amended the injunctive relief to preclude Shattuck's contact with the traveling public.

## D.  Sanctions and Modification

[¶ 22] Finally, Shattuck argues that the Superior Court erred in assessing civil penalties and modifying the injunctive relief. The Court assessed civil penalties of $5000 for each of the three reported incidents and modified the injunctive relief to prevent Shattuck from having contact with motel patrons.

[¶ 23] We review the sanctions and the modification for abuse of discretion. *See State v. DeCoster,* 653 A.2d 891, 895 (Me.1995); *Department of Envtl. Protection v. Emerson,* 563 A.2d 762, 767–68 (Me.1989). "Because this injunction is remedial in nature, the trial court has broad

---

4.  Indeed, some courts have accorded more protection to the settling defendant, in recognition of the institutional desire to encourage settlements. *See Walker v. United States Dep't of Hous. & Urban Dev.,* 912 F.2d 819, 825–26 (5th Cir.1990).

5.  *See also Fox v. United States Dep't of Hous. & Urban Dev.,* 680 F.2d 315, 323 (3rd Cir. 1982).

6.  An exception may be made when the elements necessary for the entry of a temporary restraining order are met. *See* M.R. Civ. P. 65(a) ("A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney. . . ."). The opportunity for notice and hearing must, obviously, follow the entry of any such order.

discretion to 'fashion an appropriate remedy to do complete justice.' Moreover, '[t]he court's equitable powers assume an especially broad and flexible character when ... the public interest is involved.'" *DeCoster,* 653 A.2d at 895 (quoting *State v. Bob Chambers Ford, Inc.,* 522 A.2d 362, 366–67 (Me.1987)). Significant sanctions may be appropriate to compel compliance with court orders and to protect the public. *See Town of Bar Harbor v. Evans,* 499 A.2d 157, 158 (Me.1985).

[¶ 24] Here, the record is replete with evidence supporting the need for penalties and a modification of the injunctive relief. The court was faced with an individual who repeatedly threatened and abused the public, after being fined for doing so in 1994 and again in 1996. Shattuck negotiated and signed two consent decrees, agreeing to refrain from these abusive practices and yet continued to abuse the public and threaten unsuspecting patrons. Based on his continuing disregard for the court's orders, the Superior Court acted well within its broad discretion to assess civil penalties and to modify the injunctive relief. Because the court maintains the authority to amend the injunction after proper notice and an opportunity to be heard, Shattuck may seek relief from the injunction upon a showing that he will not continue to act in a manner that violates the Act.

The entry is:

Judgment affirmed.